# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 07-20568-TLM** |
| **DAVID ALLEN MUNDT and** | ) | |
| **RITA DIANNE MUNDT,** | ) | |
| | ) | **Chapter 7** |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **PETRO CONCEPTS, INC., dba** | ) | |
| **THIESSEN OIL COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 08-7006-TLM** |
| | ) | |
| **DAVID ALLEN MUNDT and** | ) | |
| **RITA DIANNE MUNDT** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| **ALLAN SCOTT and SCOTT** | ) | |
| **LIMITED PARTNERSHIP,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adv. No. 08-7007-TLM** |
| | ) | |
| **DAVID ALLEN MUNDT and** | ) | |
| **RITA DIANNE MUNDT** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |

MEMORANDUM OF DECISION - 1

COLEMAN OIL COMPANY,⁣ )
                                    )
              Plaintiff,            )
                                    )
v.                                  )          Adv. No. 08-7008-TLM
                                    )
DAVID ALLEN MUNDT and               )
RITA DIANNE MUNDT                   )
                                    )
              Defendants.           )
_____ )
                                    )
DOUGLAS HOOGLAND,                   )
                                    )
              Plaintiff,            )
                                    )
v.                                  )          Adv. No. 08-7009-TLM
                                    )
DAVID ALLEN MUNDT and               )
RITA DIANNE MUNDT                   )
                                    )
              Defendants.           )
_____ )

## MEMORANDUM OF DECISION
_____

### INTRODUCTION

On December 21, 2007, David and Rita Mundt ("Debtors") filed a joint

chapter 7 petition for relief commencing Case No. 07-20568-TLM.[1]  Petro

Concepts, Inc. ("Petro") filed a complaint on April 25, 2008 commencing

_____

[1]  The Court takes judicial notice of its files and records in both the adversary
proceedings and the bankruptcy case, Fed. R. Evid. 201.

MEMORANDUM OF DECISION - 2

Adversary Case No. 08-07006-TLM.  In it, Petro objected to the dischargeability

of its debt under §§ 523(a)(2)(B) and (a)(4).[2]  Petro also objected to Debtors'

discharge, asserting claims under §§ 727(a)(2)(A), (a)(3), (a)(4)(A), (a)(4)(D), and

(a)(5).  Shortly thereafter, Allan Scott and Scott Limited Partnership (hereinafter

referred to collectively as "Scott"), Coleman Oil Company ("Coleman"), and

Douglas Hoogland filed adversary complaints, commencing Adversary Case Nos.

08-07007-TLM, 08-07008-TLM, and 08-07009-TLM, respectively.  Each of these

complaints requested denial of Debtors' discharge on the same § 727 grounds

advanced by Petro.[3]  Petro, Scott, and Hoogland later amended their complaints

by adding identical causes of action under § 727(a)(2)(B).[4]

The Court consolidated the four adversary proceedings for trial, which was

held on October 19, 20, and 21, 2009.  At the conclusion of the trial, the Court

took the matters under advisement.  After considering the evidence presented, the

---

[2]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[3]  Coleman also alleged a nondischargeability claim under § 523(a)(4).  Adv. No. 08-07008-TLM, at Doc. No. 1.  No evidence or argument was presented on this claim by Coleman.  Likewise, no evidence or argument was presented on Petro's § 523(a)(4) claim.  Accordingly, no relief will be granted on these claims.

[4]  While Coleman also amended its complaint, it did not add a § 727(a)(2)(B) claim.  Nevertheless, evidence was presented and the § 727(a)(2)(B) issue was tried without objection from Debtors.  The Court therefore deems Coleman's complaint amended to conform to the evidence and to plead a cause of action under § 727(a)(2)(B).  Fed. R. Bankr. P. 7015 (incorporating by reference Fed. R. Civ. P. 15).

MEMORANDUM OF DECISION - 3

parties' arguments, and the applicable authorities, the Court concludes that Petro's

debt is nondischargeable under § 523(a)(2)(B).  In addition, Plaintiffs[5] have

established a sufficient basis for denying Debtors' discharge.  This Memorandum

of Decision constitutes the Court's findings of fact and conclusions of law.  Fed.

R. Bankr. P. 7052.

**FACTS**

David and Rita Mundt were married in 1978 and reside in Grangeville,

Idaho with their adult son, Brad Mundt.  David[6] is a high school graduate.  He has

more than thirty years experience driving and servicing trucks.  Part of this

experience was gained while Debtors owned, solely or with others, and operated

their own trucking businesses.  These businesses were Western Transfer LLC and

Provident Transportation LLC.

### A.    Western Transfer LLC

#### 1.    Creation

In 2000, David was working as a mechanic and truck driver for Dean

Rowan, Inc. ("DRI").  In May of that year David and a co-employee, Allan Scott,

decided to purchase the freight hauling component of DRI, which included five

trucks and six sets of trailers, from its owner, Dean Rowan.  The parties negotiated

---

[5] The Court will refer to Petro, Scott, Coleman, and Hoogland collectively as "Plaintiffs."

[6] For clarity, the Court will occasionally refer to Debtors by their first names.

MEMORANDUM OF DECISION - 4

an agreement whereby David and Scott agreed to pay Rowan approximately

$700,000.00 in exchange for the transfer of a 95% ownership interest in the

company, with 47% going to David and 48% to Scott.  They reorganized the

company as a limited liability company and named it Western Transfer LLC.  *See*

Ex. 145 (Responses to Plaintiff's Interrogatories and Request for Production) at

Responses to Requests Nos. 3 and 5. In time Rowan conveyed the 5% interest he

had retained, making David and Scott the only members of Western, with 49%

and 51% interests, respectively.

Western was operated as a trucking business, hauling timber and building

materials for clients in the Pacific Northwest.  As majority owner, Scott functioned

as the managing member of Western.  His responsibilities included driving,

repairing and maintaining the trucks and other equipment, keeping the books and

records of the business, and generally making final decisions regarding the

business.  David also drove, repaired and maintained the trucks and equipment,

and conferred with Scott on management decisions.  Western employed a

dispatcher and a number of drivers to aid in operations.

In addition to the trucks and trailers Scott and David initially acquired from

DRI, Western entered into lease agreements for trucks to haul its loads.  Typically,

these lease agreements were between Western and a single-member limited

liability company created for the purpose of owning one or more trucks and

MEMORANDUM OF DECISION - 5

trailers to be leased for use in freight hauling operations such as Western.

By the end of 2004, David and Scott had paid off Western's $700,000.00 purchase price with $500,000.00 generated from the business, a $140,000.00 loan from Scott Limited Partnership, a partnership in which Scott was a limited partner,[7] and other personal investments. Sometime during that same year, Scott and David began discussing a buyout of Scott's interest. In June, 2004 Scott's management role in Western decreased as David began to assume management of day-to-day operations, though Scott continued to hold a majority interest in the business. As part of this transition, Rita began maintaining Western's records and books.

In February, 2005 Scott reached an agreement in principal to sell his interest to David for $70,000.00. Western agreed to give Scott some equipment and execute a $70,000.00 promissory note in his favor for repayment of various personal loans Scott had made to Western.[8] Western also agreed to provide Scott a cellular telephone and health insurance for three years from the date of the agreement.

Around this same time, David granted a 10% membership interest in

---

[7] Scott Limited Partnership filed a proof of claim asserting that it was still owed $67,750.66 on this loan when Debtors' filed bankruptcy. Claim No. 42-1.

[8] Scott filed a proof of claim in Debtors' bankruptcy case. Claim No. 41-1. In it, he asserts that at the time of filing he was owed $38,558.55 by David, individually, and $29,800.00 by Western, totaling $68,358.55.

MEMORANDUM OF DECISION - 6

Western to Douglas Hoogland.  Hoogland had worked in the trucking business with David off and on since 1975 and was employed by Western as a driver.  In 2000, Hoogland began leasing a truck to Western and, after receiving the 10% ownership interest in 2005, he agreed to lease two more trucks to the business through his company Last Chance Trucking LLC.

In the spring of 2005, a purchase and sale agreement was executed memorializing the agreement Scott and David had reached in February.  Although the papers were signed in April, they were backdated February 5, 2005.  Scott continued working as a mechanic with Western until the end of April.  Thereafter, he did not work as an employee of Western though he occasionally "helped out" when needed and would generally "discuss business" with David.[9]

## 2. Finances

Western contracted with Bay View Funding ("Bay View"), an invoice factoring company, to expedite its cash flow and manage its billing.  Western would send an invoice to Bay View and, in turn, Bay View would advance approximately 90% of the payment represented by the invoice while holding 10%

---

[9] Scott helped out in the Western office for 3 to 4 months in the summer of 2006 so that David and Hoogland could help haul loads.  In addition, when filling out a health benefit plan enrollment form in April 2006, Scott listed himself as employed by Western as a "mechanic-consultant," making $1,500.00 per month.  Despite these representations, Scott testified that he never received a paycheck from Western and that he completed the enrollment form so Western could provide health insurance to him and his dependents per the terms of the buyout agreement.

MEMORANDUM OF DECISION - 7

in a reserve account pending receipt of payment from the customer.  Once the customer remitted payment to Bay View in full, the reserve account funds became available for release to Western, less approximately 1.75% of the total invoice which Bay View deducted as a fee for its services.  If a customer failed to pay or was short on a payment, Bay View charged back the unpaid amount from Western's reserve account.  Bay View handled approximately 80% of Western's customer accounts.  The other 20% of the customers paid either Western or the owner-operator of the truck directly.  The truck owners-operators received 90% of the payment on an invoice, while Western received either 10% or 8.25%, depending on whether or not the account was factored through Bay View.

Western was paid based on the weight of each load and the distance it was hauled.  Generally, it received between $2.00 and $3.00 per mile, and the average distance hauled was between 200 and 300 miles.  From 2004 to 2007, Western grossed somewhere between $1.5 million and $3 million in receipts each year. *See* Exs. 111-115.

Each month David drew a distribution of an unspecified amount out of Western as a "salary."  Western also paid for Debtors' medical insurance and some of David's fuel expenses, and paid $500.00 a month for use of Debtors' personal pick-up truck.

Western had difficulty staying current on its payroll taxes.  *See* Exs. 150-

MEMORANDUM OF DECISION - 8

153.  In March, 2006 Sandy Crossman, an agent from the Internal Revenue Service ("IRS"), visited Western's office and demanded payment of delinquent payroll taxes, with penalties and interest, from 2004, threatening to shut down operations if Western did not pay its obligations.  To avert closure, Rita and Hoogland took cash advances on personal credit cards of $4,500.00 and $20,000.00, respectively, to pay the IRS.[10]  In addition, Western agreed to pay $2,750.00 a week from its reserve account with Bay View to bring its payroll taxes current.  Western began making payments in September 2006, and made its final payment in November 2007.

### 3.    Bookkeeping and refinancing

In August, 2005 Debtors hired Vicky Smith to perform secretarial duties. Smith had prepared Western's tax return for 2004 while working for H & H Service, a tax preparation service in Grangeville.  *See* Ex. 111.  She also prepared Debtors' personal returns for 2004.  Smith, though not an accountant, had taken some college accounting courses and learned to prepare tax returns while working for H & H.  She prepared Western's and Debtors' tax returns for 2005 and 2006 while working for Western.  In addition, after Rita stopped working in Western's office in May 2006, Smith assumed responsibility for doing the daily invoicing and keeping the check register.  Thereafter, Smith's duties included submitting

---

[10]  Rita and Hoogland were later reimbursed by Western.

MEMORANDUM OF DECISION - 9

invoices to Bay View, paying the payroll, taxes, and bills, and keeping the check register to document the business' expenditures. She testified that the check register was the primary record used to track Western's expenditures.

On January 4, 2007, David and Hoogland signed a purchase and sale agreement transferring their entire interest in Western to Joseph Pepiot for $1 million, with $500,000.00 to be paid at closing and $500,000.00 to be paid in monthly installments over 15 years, with an interest rate of 6%.[11] Pepiot paid $100,000.00 in two $50,000.00 installments in January and February of 2007 as a down payment. The funds were deposited directly into one of Western's bank accounts.[12] Save the written agreement itself, there are no records indicating the transfer occurred, and Debtors did not disclose any information concerning the agreement with Pepiot in their bankruptcy filings.

Pepiot assumed the day-to-day management responsibilities of Western in January, 2007 while still exploring ways to finance the remainder of the buyout.[13]

---

[11] The type-written agreement initially stated a purchase price of $1.5 million, with $500,000.00 to be paid at closing and $1 million to be paid in monthly installments. The total price was reduced to $1 million, with $500,000.00 to be paid up front and $500,000.00 to be paid in installments, and the agreement was altered to reflect those changes through interlineation. *See* Ex. 145 (Responses to Plaintiff's Interrogatories and Request for Production) at Response to Request No. 17.

[12] Western had at least three bank accounts in 2007 – one with Sterling Savings Bank, another with U.S. Bank, and a third with Wells Fargo Bank. *See generally* Ex. 139A.

[13] The written agreement provided that Pepiot would acquire possession of Western and its assets "upon the completion of the signing of all documents at closing." Ex. 145 (Responses
(continued...)

MEMORANDUM OF DECISION - 10

David stayed on with Western as a driver and mechanic and continued drawing a

monthly salary, which Pepiot increased to $6,000.00 in March.  In addition,

Western continued to pay for Debtors' insurance and fuel expenses, and make

lease payments for the pick-up truck.

In May, 2007 Pepiot fired Smith and hired his brother-in-law, Justin Beard,

to handle Western's bookkeeping.

In June, 2007 it became apparent Pepiot could not secure the financing he

needed to pay David and Hoogland.  As a result, David resumed full managerial

control of Western and began having Western pay back Pepiot's $100,000.00

down payment.[14]

Though David testified that Pepiot was in full control of Western's

operations and finances from January to June of 2007, the evidence indicates

otherwise.  For example, in February, David helped negotiate the sale of a set of

1986 Alloy trailers owned by Western to Baker Truck Service for $12,000.00.

The funds were deposited into Western's account.

---

[13] (...continued)
to Plaintiff's Interrogatories and Request for Production) at Response to Request No. 17.

[14]  Apparently, Western and Pepiot considered the sale contract breached but, in lieu of
suit or other remedies, negated the transfer of the business' ownership and treated the
$100,000.00 as a loan from Pepiot.  Pepiot filed a proof of claim in Debtors' bankruptcy case in
the amount of $86,000.00 for "money loaned."  Claim No. 40-1.  When asked at trial why
Western was paying back the $100,000.00 down payment, David responded that he did not know
other than that he felt they should pay it back because the deal was never completed.

MEMORANDUM OF DECISION - 11

Then, on March 27, David, acting on behalf of Western, completed and signed a credit application with Petro Concepts, Inc., doing business as Thiessen Oil Company ("Petro"). Ex. 138. David listed himself as the manager of the company and personally guaranteed payment on the account. The credit application reported a net monthly business income for Western of $20,000.00. *See id.* Relying on these assertions, Petro extended credit to Western on an open account basis for gas and diesel.[15]

During this time, David also signed numerous checks on behalf of Western to pay business obligations. *See* Ex. 139A at tabs 1, 5 and 8.[16] Finally, no change was ever made with the Idaho Secretary of State to advise parties doing business with Western that David was no longer the managing member of that limited liability company.

On June 8, after David resumed control of the business, Western sold a set of 1995 Western trailers and four used axles to GTS Trucking for $18,250.00. The funds were deposited into Western's bank account. Later that month, Western received a $30,600.00 payment for the casualty loss of a truck Pepiot

---

[15] Debtors listed Petro as an unsecured creditor with a possible claim of $108,000.00. Doc. No. 1 at schedule F. Petro filed a proof of claim in the Debtors' bankruptcy case asserting a claim of $107,457.07 as of the petition date. Claim No. 36-1.

[16] Exhibit 139A consists of 1,319 pages of financial documents produced by Debtors to the chapter 7 trustee. Plaintiffs' counsel organized the documents into 16 tabbed sections. For convenience in locating those parts of Exhibit 139A cited to herein, the Court will include the corresponding tab numbers.

MEMORANDUM OF DECISION - 12

totaled while driving in Montana.  Approximately $10,000 of the insurance

proceeds were used to pay off outstanding debt on the truck, and the remaining

$20,600.00 were deposited in Western's account.  In August, Western received a

$10,099.00 deposit refund when it closed an account with TCH Fuel.  Those funds

were likewise deposited into Western's account.  On June 20, Debtors borrowed

$98,000.00 from Pine Tree Community Credit Union, secured by a mortgage on

their home.  They "loaned" $95,674.00 of the funds to Western and began having

Western pay the $1,112.14 monthly mortgage payment.

Despite these cash infusions in addition to operating income, by the fall of

2007, Western was facing significant financial difficulty.  In September, Debtors

contacted Jeff Coiner, a financing broker, in an attempt to refinance the business.

Coiner put Debtors in contact with Summit Leasing ("Summit"), a financing

company in Yakima, Washington.  Upon its examination of financial records,

Summit informed Western that Western's books would need to be reconfigured

before Summit would agree to a refinance.

In October, Beard, Pepiot's brother-in-law, left Western.  Western hired

Wendy Kaschmitter, whose husband was working for Western as a mechanic, to

get its financial records and books in order to secure financing from Summit.[17]

---

[17]  Kaschmitter's previous bookkeeping experience consisted of working as the office
manager of a car dealership from 1994 to 1996.

MEMORANDUM OF DECISION - 13

Debtors also enlisted the services of David Fairchild of Fairchild Accounting and
Tax Service to aid in the process.[18]

Working together, Kaschmitter and Fairchild discovered that Western had
prepared multiple, varying tax returns for 2005 and 2006, with no indication of
which of the returns had actually been filed with the IRS.[19]  Rather than using the
billing and invoicing software already in place to track Western's finances
(because they found that software confusing and unhelpful), Kaschmitter and
Fairchild ordered Western's transaction records from its banks, and, in
conjunction with the check register, used those records to begin reconstructing
Western's finances.  They soon determined that the check register was incomplete
and could not be reconciled with the bank records.  Hence, they decided to rely
solely on the bank records.

Kaschmitter entered the data from the bank records into a QuickBooks
software program which generated profit and loss statements for Western.  *See*,
*e.g.*, Ex.203.  Fairchild then used the numbers from those QuickBooks-generated
profit and loss statements to prepare new tax returns for 2005 and 2006.  Exs. 113

---

[18] Fairchild received a master's degree in business administration from Pepperdine
University.  However, he is neither a certified public accountant nor a licensed public accountant.

[19] Fairchild and Kaschmitter did not request copies of the tax returns Western had
previously filed.  When asked why they did not request copies of Western's filed returns from the
IRS, Fairchild stated that they were working under certain "time constraints" that prevented
taking such steps.

MEMORANDUM OF DECISION - 14

and 114.  Fairchild also prepared amended personal returns for Debtors for 2004, 2005, and 2006.  Exs. 106, 108 and 109.

Fairchild later prepared Debtors' 2007 personal return on April 11, 2008.  Ex. 110.  He prepared Western's tax return for 2007, a year later, on April 6, 2009.  Ex. 115.  When questioned concerning the propriety of preparing Debtors' 2007 personal return before preparing Western's return for that same year, Fairchild acknowledged that the personal return should have been prepared after determining Debtors' income or loss from the business for that year, and represented that an amended return had been filed for Debtors' to reflect the $25,100.00 loss reported in Western's 2007 return.  However, no copy of an amended return was provided to the chapter 7 trustee or presented to the Court during trial.

In summary, Fairchild did not audit or review Western's books and records.  His labors consisted solely of taking the data transferred by Kaschmitter from Western's bank records into QuickBooks, which was then used to generate profit and loss statements, and  preparing tax returns for the years 2005, 2006, and 2007, all with the primary purpose of securing financing from Summit in the fall of 2007.  Fairchild and Kaschmitter both testified that the books and records maintained by Western were unreliable, and they serially rejected use of software-based records, prior tax returns, and the check register in favor of the data

MEMORANDUM OF DECISION - 15

reconstructed from bank records.

### 4.      Closure and dissolution

In November 2007, Western discovered that it would be unable to refinance

through Summit, despite Kaschmitter's and Fairchild's efforts.  Consequently, on

November 16, 2007, Western ceased operations and recalled its drivers.  Having

lost their primary source of income, but remaining liable on many business debts,

Debtors filed for chapter 7 relief on December, 21, 2007.   Debtors' schedule B

lists a 100% ownership interest in Western.[20]  Though a value of $1.00 is shown,

the property description indicates that the actual dollar value of the interest is

unknown.  Ex. 101.

Western was administratively dissolved on May 8, 2008.

### B.      Provident Transportation LLC

In February, 2005 Rita organized Provident Transportation LLC

("Provident"), a single-member limited liability company with a single employee

– Gerald Patterson.[21]  Rita contributed a truck and two trailers she had purchased

with money she received from her father.

Like other owner-operators, Provident leased its truck and trailers to

---

[20]  In June, 2007 Hoogland reconveyed his 10% interest in Western to David.  No written
record of the reconveyance was presented at trial, though David testified that Hoogland had an
attorney prepare, and Hoogland executed, an instrument reconveying his interest to David, and
that the instrument was backdated to January 1, 2007.  The record is devoid of any evidence as to
whether Hoogland received consideration for reconveying his interest.

[21]  Patterson was also employed by Western as a driver.

MEMORANDUM OF DECISION - 16

Western for use in hauling freight.  As owner, Rita received 90% of an invoice hauled by her truck, less expenses.  However, in 2007 when Western began to struggle financially, Rita decided to put her business' income directly into Western and instead draw a flat $5,000.00 per month salary from Western.  Rita paid Provident's expenses from her $5,000.00 monthly draw.  This included a truck payment of somewhere between $800.00 and $1,000.00 and a $400.00 trailer payment, which left Rita with a net of just over $3,500.00 per month.  This income to Debtors was in addition to the money David was drawing from Western each month.  And certain of  Debtors' personal expenses were being paid by Western (*i.e.*, health insurance, mortgage payment, payment on pick-up truck lease, and fuel).

In their schedule B, Debtors list a 100% ownership interest in Provident with a nominal value of $1.00 and an assertion that the actual dollar value of the interest is unknown.  *Id.*

Provident Transportation was administratively dissolved on June 5, 2008.

### C.    **Horace Henderson Trust**

On December 29, 2007, eight days after Debtors filed their petition, Rita's father, Horace Henderson died.  Henderson's estate was to be distributed pursuant to the terms of Henderson's Last Will and Testament ("Will"), Ex. 120, and the Horace Henderson Revocable Living Trust ("Trust"), Ex. 121, both executed on

MEMORANDUM OF DECISION - 17

October 23, 1995.[22]  Henderson's Will contained a pourover provision devising all of his property, save certain personal property items described in a handwritten addendum to the Will, to the Trust.  *See* Ex. 120.  In turn, upon Henderson's death the Trust assets were to be distributed equally between Henderson's four children, including Rita.  *See* Ex. 121.  Richard Henderson, Rita's brother, is both the personal representative under the Will and trustee of the Trust.  *See* Exs. 120 and 121.

The evidence indicates that the Trust was comprised of some stock and investment accounts, a U.S. Bank checking account, and a real estate mortgage and collateral note from Brad Mundt in the amount of $29,945.04.[23]  As trustee, Richard distributed $21,333.34 to Allen Henderson on November 18, 2008; $21,333.33 to Marie Ingram in two separate checks, issued on October 21, 2008

---

[22]  The Horace Henderson Revocable Living Trust was one of three separate trusts created by Exhibit 121, titled "The Henderson/Twogood 1995 Revocable Living Trust."  While an amendment to Exhibit 121 was executed on May 29, 2001, the amendment impacted only the Marine Twogood Revocable Living Trust, one of the two other trusts created by the 1995 instrument.  *See* Ex. 122.

[23]  On November 9, 2007, Rita, acting under power of attorney, issued a check on Henderson's bank account to U.S. Bank for $29,945.00 to pay off a loan secured by a 10-acre parcel of land Debtors personally owned near Grangeville.  Ex. 116.  Four days later, Debtors conveyed the 10-acre parcel to Brad by warranty deed, with certain restrictive covenants.  *See* Ex. 117.  Six months later, after Debtors' filing and after Henderson's death, Brad executed a promissory note in favor of Henderson for $29,945.04.  Ex. 118.  The note was secured by a mortgage on the 10-acre property Debtors had previously deeded to Brad.  *Id.*  Although the language of the note and mortgage instrument identifies Henderson as both the payee on the note and the mortgagee, the document was signed by Richard Henderson, acting as personal representative of Henderson's estate, as Henderson had died over four months prior.  *See id.*  Brad has not made any payments on the note.

MEMORANDUM OF DECISION - 18

and November 21, 2008; and $19,742.06 to himself on February 12, 2009.[24]  *See*

Ex. 208.  Richard stated that these distributions, totaling $62,408.73, represented

the entire Trust estate except the mortgage and note from Brad.[25]  Rita has not

received a distribution from the Trust estate, though beginning December 5, 2007,

Richard has been personally paying Debtors' $1,112.14 monthly home mortgage

payment directly to Pine Tree Credit Union.[26]

Ford Elsaesser, the chapter 7 trustee in Debtors' bankruptcy case

("Trustee"), testified that Debtors did not notify him of Rita's interest in the Trust

estate and that he was first advised of the Trust by Plaintiffs' attorneys.  On

February 25, 2008, about two months after Henderson's death, Rita submitted an

affidavit in Debtors' bankruptcy case indicating that her father had passed away

and averring that she would inherit nothing from his estate because her portion,

which she alleged was $5,000.00, had been advanced to her in 1986.  Doc. No. 23.

When asked at trial why she did not earlier disclose any information to Trustee

---

[24]  Allen Henderson and Marie Ingram are Henderson's two other children.

[25]  On April 23, 2009, the chapter 7 trustee filed a complaint to avoid the transfer of the 10-acre parcel to Brad under § 548 and requesting an order requiring the release of the mortgage by Henderson's estate.  Adv. No. 09-07021-TLM, at Doc. No. 1.  Debtors conceded that the transfer was avoidable and surrendered the 10-acre property to the trustee.  *See id.*, at Doc. No. 12.  They also admitted that Henderson's estate should be ordered to release the mortgage on the property.  *See id.*  On December 4, 2009, the parties filed a "Stipulation to Dismiss" that adversary proceeding based on Debtors' surrender of the parcel to the trustee.  Adv. No. 09-07021-TLM, at Doc. No. 15.

[26]  As of the trial dates, Richard had paid over $20,000.00 in mortgage payments for Debtors.

MEMORANDUM OF DECISION - 19

concerning the Trust, Rita responded that she did not know she needed to because

her father passed away after Debtors filed their petition.  She added that she was

not entitled to any portion of the Trust estate because, in addition to the $5,000.00

she received in 1986, her father had given her money on two other occasions –

once in 1997 to help pay for her daughter's college education, and again in 2004

in the amount of $25,000.00 – with the understanding that Rita would not receive

anything from his estate when he died.  Richard testified he did not know what

Henderson had given Rita and that he never had any discussions with Henderson

concerning an advancement of Rita's share of the estate.

## DISCUSSION AND DISPOSITION

### A.    Denial of discharge generally

Denial of discharge is one of the harshest sanctions this Court can levy.

Accordingly, the statutory requirements for denying a discharge, whether

generally under § 727 or in the case of a particular debt under § 523, are strictly

construed against objecting creditors and in favor of debtors to further the

Bankruptcy Code's underlying policy of providing a "fresh start."  *Sterling Int'l,*

*Inc. v. Thomas (In re Thomas)*, 03.3 I.B.C.R. 178, 181, 2003 WL 21981707, at *6

(Bankr. D. Idaho 2003) (denying discharge under § 727(a)(4)(A)); *Jett v. Sicroff*

*(In re Sicroff)*, 401 F.3d 1101, 1104 (9th Cir. 2005) (finding debt to be non-

dischargeable under § 532(a)(6)).  "The reasons for denial of discharge must be

real and substantial rather than technical and conjectural."  *Thomas*, 03.3 I.B.C.R.

MEMORANDUM OF DECISION - 20

at 181, 2003 WL 21981707, at *6 (quoting 6 COLLIER ON BANKRUPTCY ¶ 727.01

(Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2002)).  While an

objecting plaintiff must make a "persuasive" showing, the standard of proof is that

of a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991);

*Searles v. Riley (In re Searles)*, 317 B.R. 368, 376 (9th Cir. BAP 2004) (applying

*Grogan* to § 727(a) actions).

### B.      Section 523(a)(2)(B)

Petro contends that, pursuant to § 523(a)(2)(B), David's representation of

Western's $20,000.00 net monthly income on the March 27, 2007 credit

application ("Application") excepts his guarantee debt to Petro from discharge.

Under § 523(a)(2)(B), a discharge under § 727 does not discharge an

individual debtor from any debt –

> (2) for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by –
>   . . .
>       (B) use of a statement in writing –
>               (i) that is materially false;
>               (ii) respecting the debtor's *or an insider's* financial
>               condition;
>               (iii) on which the creditor to whom the debtor is liable
>               for such money, property, services, or credit reasonably
>               relied; and
>               (iv) that the debtor caused to be made or published with
>               intent to deceive . . . .

(emphasis added).

The Ninth Circuit has reworded the § 523(a)(B)(2) elements as follows:

MEMORANDUM OF DECISION - 21

(1) a representation of fact by the debtor,
(2) that was material,
(3) that the debtor knew at the time to be false,
(4) that the debtor made with the intention of deceiving the creditor,
(5) upon which the creditor relied,
(6) that the creditor's reliance was reasonable,
(7) that damage proximately resulted from the representation[,]

*Wells Fargo Bank Northwest, N.A. v. Covino (In re Covino)*, 04.3 I.B.C.R. 98, 105

(Bankr. D. Idaho 2004) (quoting *Candland v. Ins. Co. of N. Am. (In re Candland)*,

90 F.3d 1466, 1469 (9th Cir. 1996)), with the threshold requirement that the

representation must be in the form of a written statement concerning the debtor's

or an insider's financial condition, *id.* (citing *Tallant v. Kaufman (In re Tallant)*,

218 B.R. 58, 69 (9th Cir. BAP 1998)).

### 1.    Debt for extension of credit obtained by use of a statement in writing

David is indebted to Petro.  While the written Application was submitted on

behalf of Western, and the open credit account was established in Western's name,

by guaranteeing Western's obligation David incurred personal liability on Petro's

claim for any unpaid charges.  Accordingly, Debtors' did not contest their liability

on Petro's claim in their answer to Petro's amended complaint,[27] their schedules in

the bankruptcy case, Exs. 101 -104, or at trial.  David also conceded at trial that

Western obtained credit from Petro based on his submission of the written

---

[27]   There, Debtors stated: "With regard to Plaintiff's general preliminary allegations,
Defendants admit there may have been a creditor-debtor relationship between them individually
and the Plaintiff."  Adv. No. 08-7006-TLM, at Doc. No. 29.

MEMORANDUM OF DECISION - 22

Application.

## 2.     Material falsity

A statement may be materially false if it includes information that is "substantially inaccurate" and is of the type that would affect a creditor's decision-making process.  To except a debt from discharge, the creditor must show not only that a statement is inaccurate, but also that it contains an important and substantial untruth.  *Covino*, 04.3 I.B.C.R. at 106 (citing *Candland*, 90 F.3d at 1470).

David's representation of Western's net monthly income in the Application was materially false.  Western's tax returns for 2006 and 2007 report losses of $445,822.00 and $25,100.00.  Though the state of Western's financial records makes it impossible to determine exactly Western's net monthly income in March 2007, *see* discussion *infra*, it is clear that it was substantially less than $20,000.00.  Indeed, David conceded on cross-examination that he could not recall Western ever generating $20,000.00 in net monthly income.  And, since the object of the Application was to assess Western's financial ability to pay, representations as to Western's regular income were clearly material to Petro's decision to extend credit.

## 3.     Statement respecting an insider's financial condition

Because David's representation concerned Western's net monthly income,

MEMORANDUM OF DECISION - 23

and not Debtors' financial condition,[28] the Court must determine whether Western

qualifies as an "insider."

Insider is defined by § 101(31) of the Bankruptcy Code. Where the debtor

is an individual, like David, the term "insider" includes, *inter alia*, a "corporation

of which the debtor is a director, officer, or person in control[.]" Section

101(31)(A)(iv).[29] The term "corporation" is further defined by § 101(9)(A) to

include –

> (i) association having a power or privilege that a private corporation,
> but not an individual or a partnership, possesses;
> (ii) partnership association organized under a law that makes only the
> capital subscribed responsible for the debts of such association;
> (iii) joint-stock company;
> (iv) unincorporated company or association; or
> (v) business trust[.]

"[A]n LLC, by virtue of its structure and limited liability features, fits

comfortably within the Bankruptcy Code's definition of 'corporation' in

[§ 101(9)]." *Gilliam v. Speier (In re KRSM Properties, LLC)*, 318 B.R. 712, 717-

18 (9th Cir. BAP 2004). As the managing member and a 90% owner, David was a

---

[28] The Application is vague as to whether it calls for the net monthly income of the individual signing the Application as guarantor or of the business obtaining the credit. *See* Ex. 138. After requesting information concerning both the entity requesting credit and the signor, the Application merely asks for "*Your* net monthly income" without any further specification. *Id.* However, the testimony of David and Karen Denevan, Petro's secretary and treasurer, revealed that the $20,000.00 figure was intended to be, and was understood to be, a representation of Western's net monthly income. Given the application's purpose, and construing the document as a whole, the Court agrees.

[29] Section 102(3) provides that when used in the Code the term "includes" is not limiting.

MEMORANDUM OF DECISION - 24

"person in control" of Western at the time he completed the Application. Thus,

under § 101(31)(A)(iv), Western is an "insider" of David for purposes of

analyzing Petro's § 523(a)(2)(B) claim.

### 4.    Intent to deceive

Here, the primary issue is whether David made the representation with the

intention of deceiving Petro, knowing it to be false.

"The scienter requirement for a fraudulent misrepresentation is established

by showing 'either actual knowledge of the falsity of a statement, or reckless

disregard for its truth . . . .'" *Covino*, 04.3 I.B.C.R. at 106 (quoting *Gertsch v.*

*Johnson & Johnson, Fin. Corp.(In re Gertsch)*, 237 B.R. 160, 167 (9th Cir. BAP

1999)). Intent to deceive may be inferred from the totality of the circumstances,

including reckless disregard for the truth. *Gertsch*, 237 B.R. at 167-68; *see also* 4

COLLIER ON BANKRUPTCY ¶ 523.08[2][e][ii] (Alan N. Resnick & Henry J.

Sommer eds., 15th ed. rev. 2009).  In the Ninth Circuit, the BAP has further

clarified that recklessness, though not alone equating fraudulent intent, can be

probative of such intent. *Khalil v. Developers Sur. and Indem. Co. (In re Khalil)*,

379 B.R. 163, 173-74 (9th Cir. BAP 2007) (discussing fraudulent intent in the

context of § 727(a)(4)(A)). The essential point is that there must be something

about the adduced facts and circumstances which suggests that the debtor intended

to deceive. *See id.* at 174-75 (quoting *Garcia v. Coombs (In re Coombs)*, 193

B.R. 557, 565-66 (Bankr. S.D. Cal. 1996)).

MEMORANDUM OF DECISION - 25

Debtors acknowledge that the $20,000.00 representation was false.  They

contend, however, that David was unaware of Western's financial condition at the

time he made the representation.  David also claims that he obtained the

$20,000.00 figure from Vicky Smith, upon whom he had no reason not to rely.

David's assertions are unpersuasive.  The evidence indicates that David

*was* involved in and aware of Western's finances.  David had been involved in

running Western for close to seven years and had been the sole managing member

for two years.  Western was Debtors' primary source of income, and David

testified at trial that he did not recall Western ever generating a net profit of

$20,000.00 per month.  And, contemporaneous with submission of the

Application, David was signing Western's checks and selling a set of 1986 Alloy

trailers owned by Western.

Further, Smith adamantly denied David's contention that she provided him

with the $20,000.00 figure and testified she never discussed the Application with

him.  The Court finds Smith's testimony more credible.  It was David who

completed the Application, signed it, and personally guaranteed Western's

obligation.  Thus, if David was truly unaware of Western's financial condition, as

Debtors contend, there would have been no basis for his $20,000.00 net monthly

income representation.  Making such a baseless representation constitutes a

reckless disregard for the truth.  *Gertsch*, 237 B.R. at 168 ("[A] misrepresentation

is fraudulent if the maker . . . does not have the confidence in the accuracy of his

MEMORANDUM OF DECISION - 26

representation that he states or implies, or . . . knows that he does not have the basis for his representation that he states or implies.") (quoting RESTATEMENT (SECOND) OF TORTS § 526 (1977)).

In short, the Court finds David's representations that he was unaware of Western's financial condition, and that he simply relied on a figure given to him by Smith not credible.

David knew the application was a prerequisite to obtaining the credit Western needed, and material to Petro's decision-making process.  David was aware Western's net monthly income was not $20,000.00 at the time he submitted the Application.  He made the misrepresentation to secure credit which Western might not have been able to obtain had he reported Western's true financial condition.  David's written statement regarding Western's financial condition was knowingly false and made with intent to deceive.

### 5.    Reasonable reliance

Debtors concede that Petro relied on David's representation in the Application.  The Court must, and does, find that Petro's reliance was reasonable.

Under the objective standard of reasonable reliance, investigations may not be required, and "assertions of fact as to . . . [the] financial status of corporations, and similar matters . . . may justifiably be relied on without investigation, not only where such investigation would be burdensome or difficult . . . but likewise where the falsity of the representation might be discovered with little effort by means

MEMORANDUM OF DECISION - 27

easily at hand." *Covino*, 04.3 I.B.C.R. at 107 (quoting *Candland*, 90 F.3d at 1469); *see also Smith v. Lachter (In re Smith)*, 242 B.R. 694, 702 (9th Cir. BAP 1999) ("[W]hen there is evidence of materially fraudulent statements, little investigation is required for a creditor to have reasonably relied on the representations."); *Gertsch*, 237 B.R. at 170 (noting that lenders do not have to hire detectives before reasonably relying on financial statements).

Denevan testified that there was no information then available to her to suggest that David's representations in the Application were inaccurate. Although the Application authorized Petro to initiate a credit investigation, *see* Ex. 138, such an effort was not required for Petro to reasonably rely on the Application.

### 6.     Proximate causation of injury

The final element is proximate causation of injury to the creditor. Denevan testified that Petro relied on, in particular, David's representation that Western's net monthly business income was $20,000.00 in deciding whether to extend credit to Western. This testimony was uncontroverted. The Court finds that but for David's representation of a $20,000.00 net monthly income, Petro would not have extended open credit to Western for fuel and diesel. The injury to Petro is $107,457.07, the amount of David's guarantee of Western's unpaid fuel charges. That amount is nondischargeable under § 523(a)(2)(B) as to David's separate

MEMORANDUM OF DECISION - 28

property and Debtors' community property.[30]

### C.    Section 727(a)(3)

Section 727(a)(3) denies a discharge to a debtor who "has concealed,

destroyed, mutilated, falsified, or failed to keep or preserve any recorded

information, including books, documents, records, and papers, from which the

debtor's financial condition or business transactions might be ascertained, unless

such act or failure to act was justified under all of the circumstances of the case[.]"

Unlike many of § 727's denial of discharge provisions, section 727(a)(3) does not

require that the failure to keep or preserve adequate financial records be

"knowing" or "fraudulent."  *See Thomas*, 03.3 I.B.C.R. at 183, 2003 WL

21981707, at *9 (citing *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1297 (9th

Cir. 1994)).

The purpose of § 727(a)(3) is to make the privilege of discharge dependent

on a true presentation of the debtor's financial affairs.  *Caneva v. Sun*

*Communities Operating L.P. (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008)

(citing *Cox*, 41 F.3d at 1296).  Creditors are not required to risk "the withholding

---

[30] David's liability on the debt as a signing guarantor has been addressed above.  Rita,
however, did not sign the Application, nor was there any evidence that she was aware of or
involved in David's misrepresentation to Petro.  Notwithstanding the lack of evidence of
wrongdoing on Rita's part, David's debt to Petro is presumed to be a community debt.  *United
States Trustee v. Warr (In re Warr)*, 410 B.R. 891, 896, 09.1 I.B.C.R. 11, 12 (Bankr. D. Idaho
2009) ("In Idaho, indebtedness incurred by a spouse during marriage is presumed to be a
community obligation.") (citing *Simplot v. Simplot*, 526 P.2d 844, 851 (Idaho 1974)).  No
evidence was presented to rebut this presumption.  Thus, Debtors' community property is subject
to liability for the debt to Petro under §§ 524(a)(3) and 541(a)(2).

MEMORANDUM OF DECISION - 29

or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records." *Id.* (quoting *Burchett v. Myers*, 202 F.2d 920, 926 (9th Cir. 1953)).

Section 727(a)(3) "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." *Caneva*, 550 F.3d at 762 (quoting *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999)). The court, creditors, and the trustee need not undertake an independent investigation of the debtor's affairs, speculate as to the financial history or condition of the debtor, or sift through documents in order to attempt to reconstruct the debtor's financial status. *Thomas*, 03.3 I.B.C.R. at 183, 2003 WL 21981707, at *10 (quoting *In re Connors*, 273 B.R. 764, 769-79 (S.D. Ill. 2001)). "[T]hey have a right to be supplied with dependable information on which they can rely in tracing a debtor's financial history." *Id.* While § 727(a)(3) does not require absolute completeness in making and keeping records, it requires a debtor to "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Caneva*, 550 F.3d at 761 (quoting *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir. 1971)).

To a state a prima facie case under § 727(a)(3), a creditor must show "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and

MEMORANDUM OF DECISION - 30

material business transactions." *Caneva*, 550 F.3d at 762 (quoting *Cox*, 41 F.3d at

1296).  The adequacy of a debtor's financial books and records must be decided

on a case-by-case basis, with consideration for the debtor's business operations

and sophistication.  *Id.* at 761.  The inquiry focuses on the nature and extent of

books and records others in like circumstances would ordinarily keep.  *Thomas*,

03.3 I.B.C.R. at 183, 2003 WL 21981707, at *9 (quoting *Cox*, 41 F.3d at 1297).

Once a creditor shows inadequate or nonexistent records, the burden shifts

to the debtor to justify with a "credible explanation" the inadequacy or

nonexistence of the records.  *Id.*  A debtor must show more than that he did not

comprehend the need for financial records; he must show that because of unusual

circumstances he was absolved from the duty to maintain records himself.  *Id.*

### 1.    Debtors' personal records

Plaintiffs contend that Debtors have concealed their personal financial

records by failing to provide those records to Trustee and the creditors.  At trial,

Trustee testified that he provided to Plaintiffs all of the financial records produced

to him by Debtors, both business and personal.  He further represented that he had

not received a full set of personal financial records and that he was still seeking

Debtors' personal bank records.[31]  In response, Debtors testified that they had

copied and sent their personal banking records to Trustee.  In addition, Wendy

---

[31]   Trustee stated that while Debtors had voluntarily given him authorization to obtain
their personal bank records, Debtors themselves had not turned over the records.

MEMORANDUM OF DECISION - 31

Kaschmitter testified that she assisted in and observed the preparation and sending of Debtors' personal financial records with their business records.  In light of the conflicting testimony, the Court cannot conclude that there is preponderating evidence establishing that Debtors concealed their personal bank records by not surrendering them to Trustee or Plaintiffs.

### 2.    Western's records

While Debtors' personal financial records are clearly pertinent to the § 727(a)(3) analysis, Western's records are also relevant, though Western itself is not a debtor.[32]

"Under appropriate circumstances a debtor may be denied a discharge based on his failure to keep, maintain or preserve records belonging to a separate, but closely held corporate entity."  *Thomas*, 03.3 I.B.C.R. at 183, 2003 WL 21981707, at *11 (quoting *Blanchard v. Ross (In re Ross)*, 1999 WL 10019, at *4 (Bankr. E.D. Pa. 1999)); *accord Caneva*, 550 F.3d 755; *United States Trustee v. Caron (In re Caron)*, 411 B.R. 706 (Bankr. D. Oregon 2008).  Indeed, the language of § 727(a)(3) does not expressly limit the inquiry to those records which belong to a debtor, and § 521(4) requires a debtor to surrender to a trustee any books and records related to property of the estate even if such records are not themselves property of the estate.  *Thomas*, 03.3 I.B.C.R. at 183, 2003 WL

---

[32]   The Court's discussion here includes only Western's records.  The parties did not focus much attention on Rita's business, Provident, which she folded into Western in 2007.

MEMORANDUM OF DECISION - 32

21981707, at *11 (citing *Ross*, 1999 WL 10019, at *4).  However, the facts of

each situation must be analyzed with the language and statutory purpose of

§ 727(a)(3) in mind.  *Id.*

On the facts and circumstances established, the adequacy of Western's

records is material to the question of Debtors' discharge under § 727(a)(3).

Western was a closely-held company in which Debtors were heavily invested.

David was the sole member of the company and he was responsible for the

decision-making and financial affairs of the business.  Western represented

Debtors' primary source of income and primary source of debt.  Without

Western's business records, no effort to accurately ascertain Debtors' financial

condition or relevant business transactions could be expected to succeed.  *See id.*

### 3.      Adequacy of Western's records

The Court has carefully reviewed and evaluated Debtors' records related to

Western to extent they were offered into evidence.  It finds them inadequate under

the foregoing standards of § 727(a)(3).

The following records were presented at trial – (1) Western's bank

transaction records from Sterling Savings Bank, U.S. Bank, and Wells Fargo

Bank, Ex. 139A at tabs 1- 9; (2) Bay View's processed invoice batch reports for

Western for 2005 thru 2007, *id.* at tab 15; (3) Western's billing invoices by

customer for 2005 thru 2007, *id.* at tab 16; (4) Western's tax returns for 2005,

2006, and 2007, as prepared by Fairchild, Exs. 113 - 115; and (5) the 2007 profit

MEMORANDUM OF DECISION - 33

and loss statement prepared by Kaschmitter and Fairchild as part of Western's

attempt to secure refinancing through Summit. Ex. 203 ("P & L Statement").[33]

Of the three sets of Western bank records, two include images of the checks

paid, while the third, from U.S. Bank, does not. Consequently, the only

information that can be gleaned from the U.S. Bank records with respect to paid

checks is the check number, the date of the check, the reference number, and the

amount of the check. These records do not identify the payees or the purposes for

the payments. During 2006 and 2007, the two years preceding Debtors'

bankruptcy filing, Western paid out checks totaling $1,072,341.14 from its U.S.

Bank account. Creditors and Trustee are left to speculate as to the nature of these

transactions, thus preventing them from tracking Western's financial dealings with

any reasonable accuracy.

The Western records kept by Debtors fail to cure this inadequacy. Besides

the bank records, Western's tax returns and the 2007 P & L Statement are the only

---

[33] Using QuickBooks, Kaschmitter and Fairchild created "balance sheets" for Western
for 2006 and 2007 that were also produced and discussed during the trial. *See* Ex. 139A at tab
13. However, Kaschmitter, who prepared the documents, testified that they were not balance
sheets in the true sense, and that they could not be relied upon to accurately determine Western's
financial condition. Therefore, they do not merit the Court's consideration. Nor do they help
satisfy Debtors' § 727(a)(3) burdens.

Reference was also made to Western's checkbook register, but the register was not
provided to Plaintiffs or Trustee, nor was it produced at trial. Furthermore, Kaschmitter testified
that in reconstructing Western's books she ultimately abandoned use of the check register
because it was incomplete and could not be reconciled with Western's bank transaction records,
making the register's value as a dependable source of financial information questionable at best.

MEMORANDUM OF DECISION - 34

documents that address Western's expenditures. Kaschmitter and Fairchild testified that they entered information from the business' bank records into the QuickBooks program which they then used to generate the P & L Statement and prepare Western's tax returns. In other words, the 2007 tax return and P & L Statement are but summaries of the information contained in Western's bank records, and have no other source material or accounting integrity.[34] By their nature, those documents cannot cure the inadequacy that exists in the underlying bank records. Indeed, it is unclear, based on the evidence, how Kaschmitter and Fairchild were able to categorize expenses paid by checks drawn on the U.S. Bank account without the benefit of additional information concerning the purposes of those payments. Even ignoring this evidentiary gap, the returns and the P & L Statement, while describing generally Western's expenditures, do not identify who received the payments, nor do they allow creditors to determine which category of expenses, if any, checks drawn on the U.S. Bank account went to pay.

Finally, Western's 2007 tax return and P & L Statement themselves are inconsistent. The P & L Statement indicates a "net ordinary income" of $27,122.00 and a "net income" of $222,771.00.[35] Western's 2007 tax return, on

---

[34]  This conclusion is consistent with Fairchild's testimony that neither he nor Kaschmitter conducted an audit or formal review of Western's books and records.

[35]  It appears that $195,649.00, representing a "Loan From Owner[,]" was added to the $27,122.00 "net ordinary income" figure to arrive at a "net income" of $222,771.00. *See* Ex. 203.

MEMORANDUM OF DECISION - 35

the other hand, reports an ordinary business income of -$25,100.00.  The 2007 tax return also reports $1,570,255.00 in expenses, while the 2007 P & L Statement shows expenses of $1,517,800.05.[36]

The Bankruptcy Code does not impose upon creditors the obligation to either reconstruct Western's finances or take Debtors' word to determine which of these documents, if either, is correct.  Rather, creditors are entitled to accurate and reliable written records under § 727(a)(3).  *See Transworld, Inc. v. Volpe (In re Volpe)*, 317 B.R. 684, 690 (Bankr. D. S.C. 2003) (citing *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 885 (6th Cir. BAP 1999)).

On the whole, the financial information maintained by Western and provided by Debtors was inadequate to deal properly with a business handling nearly $2 million a year in receipts.  Such a business would be expected to maintain accurate, contemporaneous records.  Western did not.  Indeed, even Debtors own evidence – including the testimony of Fairchild and Kaschmitter regarding the lack of reliable source documents, and the need to "recreate" records in order to solicit financing from Summit – supports this conclusion.[37]

---

[36]   The discrepancy between Western's 2007 tax return and the P & L Statement can be traced to additional expenses reported in the 2007 return for payroll, depreciation (which does not appear at all in the P & L Statement), repairs and maintenance, and drug tests.  *See* Exs. 115 and 203.

[37]   None of the parties asked to exclude witnesses during trial.  As the trial progressed, several witnesses commented, without any evident personal knowledge or foundation, as to how certain financial records or other witnesses' prior testimony might be reconciled or interpreted. The Court disregards such testimony.  *See* Fed. R. Evid. 701.  However, Debtors' attempts at

(continued...)

MEMORANDUM OF DECISION - 36

Debtors' point to the quantity of documents they turned over to Trustee and Plaintiffs, 1,319 pages worth, as evidence of the adequacy of those records. However, Debtors' focus on the *quantity* of records they produced ignores the lack of *quality* of those records. That Debtors may have been forthcoming in producing all the records they had for Western is insufficient. *See Caneva*, 550 F.3d at 763. The inquiry is instead whether the records produced by Debtors are such as would customarily and reasonably be kept by others in similar circumstances. They are not.

### 4.    Debtors' justifications

To avoid a denial of discharge, Debtors must convince the Court that they were justified in not keeping adequate records. Debtors present two justifications for the inadequacy of their business and financial records with respect to Western.

First, David contends that he is not an accountant or a "tax man" and ought not to be held responsible for his inadequate record-keeping in light of his lack of accounting expertise. However, one does not need to be an accountant to prepare and maintain ledgers or other records showing how business funds are received and spent. David had at least seven years of experience running a business that collected close to $2 million in receipts annually. He handled hundreds of

---

[37] (...continued)
soliciting such testimony to explain Western's records further underscore the inadequacy of those records for purposes of tracking the business' financial condition and transactions.

MEMORANDUM OF DECISION - 37

thousands of dollars in transactions, applied for and secured significant credit from financial institutions and fuel suppliers, and maintained a payroll of approximately fifteen employees. Despite his lack of higher education, David was a businessman. The Court finds that David's lack of accounting experience does not justify his failure to ensure that adequate financial and business records were kept and preserved.

Second, David makes the related argument that, because he personally lacked accounting and bookkeeping experience, he was justified in relying on others to keep Western's financial records, and should not be held accountable for their failure to properly or adequately do so. The Court is unpersuaded. It first notes that David was the sole member and manager of Western. This is not a case where some other member or partner in the business had assumed the record-keeping responsibilities, excusing a debtor's failure to do so. *See*, *e.g.*, *Cox*, 41 F.3d 1294.[38] And, secondly, while David was certainly entitled to hire employees to keep Western's books, as the managing member he had ultimate responsibility for ensuring that the business was keeping and preserving adequate financial records. *See* Idaho Code § 53-625; Ex. 145 (Responses to Plaintiff's Interrogatories and Request for Production) at Response to Request No. 5 (Operating Agreement of Western Transfer, LLC). In short, David cannot excuse

---

[38] David did not argue, and no evidence was presented to suggest, that Hoogland, a 10% owner from February 2005 to June 2007, was ever responsible for Western's bookkeeping.

MEMORANDUM OF DECISION - 38

the inadequacy of records by pointing to alleged failures in others he hired to assist in record keeping. If they were not properly performing their duties or facilitating creation and preservation of accurate records, it was David's obligation to address and remedy that situation.

David failed to ensure that Western kept and preserved books and records from which its financial condition, and consequently David's financial condition, could be ascertained. His failure to do so was not justified under the circumstances presented. David's discharge will be denied under § 727(a)(3).

### 5.   Rita's liability

Unlike David, Rita was not a member of Western. While there was a failure to keep records regarding Western from which both Debtors' financial condition and transactions could be ascertained, to deny Rita's discharge under § 727(a)(3) the Court would need to examine whether Rita's failure to maintain such records was justified considering the extent of her involvement in the business. *See Thomas*, 03.3 I.B.C.R. at 184, 2003 WL 21981707, at *12-13.

Nevertheless, the Court concludes it need not decide the § 727(a)(3) issue as to Rita because her discharge will be denied under § 727(a)(2)(B).

### E.   Section 727(a)(2)(B)

A debtor's discharge may be denied under § 727(a)(2)(B) if

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [title 11], has transferred, removed, destroyed, mutilated, or concealed or has

MEMORANDUM OF DECISION - 39

permitted to be transferred, removed, destroyed, mutilated, or concealed –

. . .

(B) property of the estate, after the date of the filing of the petition[.]

To obtain denial of discharge under § 727(a)(2)(B), a creditor must show (1) a disposition of property by transfer, removal, destruction, mutilation, or concealment, and (2) that the debtor acted with an actual intent to hinder, delay, or defraud a creditor or the trustee. *United States Trustee v. Snodgrass (In re Snodgrass)*, 359 B.R. 278, 288 (Bankr. D. Idaho 2007) (citing *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753 (9th Cir. 1985)).

Denial of discharge need not rest on a finding of intent to defraud. Intent to hinder or delay is sufficient. *In re Bernard*, 96 F.3d 1279, 1281-82 (9th Cir. 1996). And, because a debtor is unlikely to testify directly that she had the requisite intent, the Court may deduce such an intent from circumstantial evidence, or through inferences drawn from a course of conduct. *See Snodgrass*, 359 B.R. at 288.

## 1.    Concealment of, and permission for others to transfer, property of the estate

The Court finds that Rita concealed her interest in the Trust and permitted the transfer of that interest to her three siblings.

### i.    Concealment of property of the estate

Rita failed to inform Trustee Elsaesser of the existence of the Trust and her

MEMORANDUM OF DECISION - 40

interest in the Trust assets, thus concealing it from him and creditors. Though she submitted the February, 2008 affidavit disclosing her father's passing and representing that she would receive nothing from his estate because of the $5,000.00 he had gifted to her in 1986, there was no mention of the Trust in the affidavit. *See* Doc. No. 23. This omission was despite the fact that she testified she was aware of the Trust and assisted in gathering documents for preparation of Trust tax returns. The affidavit also implied that her share of the assets in Henderson's estate was less than or equal to the $5,000.00 Rita alleged to have previously received from her father, when in fact it was more than $20,000.00. *See id.*

Rita acknowledges that she failed to disclose to Trustee what assets were held in the Trust. Her position is that the responsibility for providing that information falls on Richard Henderson, her brother and the trustee of the Trust. Plaintiffs produced an April 22, 2009 letter from Anthony Anegon, the attorney assisting Richard in informally probating Henderson's estate, to Trustee which disclosed a number of assets that were poured over into the Trust upon Henderson's death. Ex. 155. The letter, however, is expressly limited to those assets that poured over and does not address assets that were in the Trust prior to Henderson's passing. *See id.* Although Richard claimed to have provided information concerning all the Trust assets to Anegon on October 14, 2009, five

MEMORANDUM OF DECISION - 41

days before trial,[39] Trustee testified that he has yet to receive any such information.

By withholding information and hindering the disclosure of the existence of the Trust and her interest in Trust assets, Rita has concealed property of the estate from Trustee.

### ii.     Permission for others to transfer property of the estate

At some point after Henderson's death, Rita informed Richard that she did not believe she was entitled to a distribution of the Trust assets.  Accordingly, Richard divided up and distributed the assets amongst the three other siblings, issuing one $21,333.34 check to Allen Henderson on November 18, 2008, two checks totaling $21,333.33 to Marie Ingram on October 21 and November 21, 2008, and one $19,742.06 cashier's check to himself on February 12, 2009.  *See* Ex. 208.  From the evidence, Rita's purported renunciation was alone the genesis of the distribution of her interest to her two brothers and sister;  Richard testified that he did not know what money Rita had previously received and that he never discussed an advancement of Rita's interest with their father.

Rita was aware of the existence of a bankruptcy estate interest in the Trust at least by February, 2008, when her affidavit was filed.  Yet she was dealing

---

[39]   Richard stated that on October 13, 2009 he received a letter dated October 7, 2009, from Trustee requesting information relating to the Trust assets and that on the day he arrived in Idaho, October 14, 2009, from Alaska where he resides, he turned the requested information over to Anegon to be sent to Trustee.

MEMORANDUM OF DECISION - 42

unilaterally with that interest later in 2008.  The evidence indicates Trustee

Elsaesser was not made aware of these events.  In fact, disclosures to Trustee from

Ricahrd, *via* Anegon, were allegedly made on the eve of the trial.

### 2.     Intent

Rita's intent to hinder, delay, or defraud Trustee is evident from her

conduct and the surrounding circumstances.  Her purported reasons for not

disclosing her Trust interest and permitting the transfer of that interest are as

follows:  (1) she did not know she needed to disclose the Trust because her father

died after Debtors' filed their petition; and (2) regardless, she was not entitled to

any portion of the Trust assets because of money she had previously received from

her father.

As to the first rationale, § 541(a)(5) provides that "any interest in property

that would have been property of the estate if such interest had been an interest of

the debtor on the date of the filing of the petition, and that the debtor acquires or

becomes entitled to acquire within 180 days after such date" constitutes property

of the estate.  Rita's father died eight days after Debtors filed their December 21,

2008 petition.  Upon his death, Rita became entitled to 25% of the Trust assets,

per the Trust terms.  Under § 541(a)(5) Rita's interest was property of the estate

that Debtors were required to disclose.  *See* § 521(a)(1).[40]  Even if Rita may have

---

[40]   In addition, Debtors were required to surrender to Trustee any recorded information,
(continued...)

MEMORANDUM OF DECISION - 43

lacked knowledge of this Code provision at the time of the bankruptcy filing or Henderson's death, she evidently was aware as of her February, 2008 affidavit.

Concerning the second rationale, Rita is permitted to assert that she is not entitled to her share of Trust assets because of a previous arrangement with her father. However, taking such a position does not allow her to be anything less than completely candid and forthcoming with Trustee as to all facts related to the 25% interest she was entitled to per the Trust documents. Section 521 required Rita to disclose all the facts surrounding the Trust and its assets, leaving it to Trustee to perform his duties and determine whether or not he agreed with her assertion that her interest was previously negated by reason of "pre-payment." *See* § 521(a)(3). She was not entitled to make the determination that her Trust interest was pre-distributed or offset by other payments prior to Henderson's death, much less entitled to effectuate that result.

The lack of evidentiary support for Rita's position is also probative of an intent to hinder or delay. Rita adamantly maintains that she is entitled to no part of her father's estate; however, there is no documentary evidence to prevent her interest from passing to her and consequently to the bankruptcy estate. The Trust language unambiguously calls for distribution of the estate equally between Rita

---

[40] (...continued)
including books, documents, records, and papers, relating to Rita's interest in the Trust. *See* § 521(a)(4).

MEMORANDUM OF DECISION - 44

and her three siblings upon their father's death. No changes were made in Henderson's Trust or Will to reduce or eliminate Rita's share. Nor did Rita take any steps prior to bankruptcy to formally renounce her interest. While a beneficiary may renounce her interest under a nontestamentary instrument by a writing,[41] the only evidence of Rita's purported renunciation is her own statement that she and her father reached an oral understanding that monetary gifts he had given her over the years precluded her from taking from his estate.

The integrity of Rita's position is also undermined by its evolving nature over the course of the instant litigation. In her February, 2008 affidavit, Rita initially averred that the $5,000.00 she received in 1986 to help buy a home represented an advancement of her entire interest in her father's estate. Later, after it was discovered that her share was greater than $5,000.00, Rita testified in her April 22, 2009 deposition, and again at trial, that a $10,000.00 gift in the late 1990's to help enroll her daughter in college and a $20,000.00 gift she received around 2004, both from Henderson, represented an advance of her entire interest in his estate. *See* Ex. 144 at pp. 17-18.

---

[41]   Idaho Code § 15-2-801 provides that a person entitled to an interest under a testamentary or nontestamentary instrument may renounce such interest by filing in the court where proceedings concerning the decedent's estate are pending , or where they would be pending if commenced, a written instrument (i) describing the property or interest renounced; (ii) signed by the person renouncing; and (iii) declaring the renunciation and the extent thereof, within nine (9) months after the transfer or death of the decedent, or, if the taker of the property is not then finally ascertained, not later than nine (9) months after the event that determines that the taker of the property or interest is finally ascertained or his interest indefeasibly vested.

MEMORANDUM OF DECISION - 45

Based on the evidence, the Court does not find credible Rita's claim that her interest in the Trust was renounced prior to filing.  To the extent she renounced her interest after filing and directed Henderson to pay only the other heirs, she no longer held that right.

Rita concealed and permitted the transfer of her interest in the Trust with the intent hinder and delay Trustee Elsaesser.  Her discharge will be denied under § 727(a)(2)(B).

**CONCLUSION**

Upon the foregoing findings and conclusions:

(1) the claim owed Petro by Debtors is found to be nondischargeable under § 523(a)(2)(B) in the amount of $107,457.07;

(2) the § 523(a)(4) claims of Petro and Coleman will be dismissed;

(3) Debtors' discharge will be denied under § 727(a)(3), as to David, and § 727(a)(2)(B), as to Rita.

The rulings under § 727(a)(3) and § 727(a)(2)(B) eliminate the need to address further the claims raised under §§ 727(a)(2)(A), (a)(4)(A), (a)(4)(D), and (a)(5).  The Court therefore enters no further findings of fact or conclusions of law on such additional counts.

Counsel for Petro shall prepare an appropriate form of Judgment.

MEMORANDUM OF DECISION - 46

DATED:  December 9, 2009



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 47